EDMUND RICHARDSON v. MALACHIA J. FUTRELL.

1. ACCORD AND SATISFACTION. — Where a creditor takes from his debtor a receipt for the amount due him, and in the receipt the debtor agrees to invest the amount in negroes, it is a satisfaction of the original indebtedness, and the debtor is afterwards liable alone on the receipt.

2. BAILMENT: MANDATE EVIDENCE OF NEGLECT. — A mandate is a contract by which a lawful business is committed to the management of another, and by him undertaken to be performed gratuitously. The mandatary is bound to the exercise of slight diligence, and responsible for gross neglect; the fact that the mandator derives no benefit from the acts of the mandatary, is not of itself evidence of gross negligence.

3. INSTRUCTIONS TO JURY WHICH CONTAIN MERE ABSTRACT LEGAL PROPOSITIONS SHOULD NOT BE GIVEN.

4. PRINCIPAL AND AGENT: RESPONSIBILITY OF AGENT FOR FUNDS DEPOSITED WHEN THEY COMMENCE DEPRECIATING. — Where a principal entrusts money with his agent to be invested, and subsequently instructs him not to invest, the agent becomes a depositary, liable for gross neglect; and if the funds begin to depreciate while in the agent's hands, it is not his duty to return or offer to return the same to the principal, he having the same facilities as the agent for obtaining knowledge of the depreciation of the fund.

5. SAME: SAME. — If an agent who has received money from his principal to be invested, invest the same after notice from his principal not to invest, the agent makes the investment on his own responsibility, and is liable to the principal.

6. PRINCIPAL AND AGENT: WHERE GENERAL DEPOSIT OF MONEY, AGENT NOT RESPONSIBLE FOR PARTICULAR BILLS RECEIVED. — Where an agent receives money of his principal, on general deposit, and is always ready to pay the same, he is not liable to account for the special notes received.

ERROR to the Circuit Court of Hinds county. Hon. John Watts, judge.

Futrell sued Richardson in an action of assumpsit. The declaration contains two counts: the first is on a receipt in the words and figures following:

"$6850.                    YAZOO COUNTY, MISS., January 23, 1863.

"Received of M. J. Futrell, six thousand eight hundred and fifty dollars, to be invested for him in negroes as my judgment may direct, and to be accounted for by me.

"E. RICHARDSON."

— and alleges that Richardson did not invest the money, and has failed to account for it. The second count is for work and labor, and for money lent to the amount of $6850.

Defendant pleaded non assumpsit and payment, with special notice that proof would be introduced that the money received by Richardson was "Confederate money"; that part of it was invested in slaves for plaintiff, and the remainder kept by Richardson for plaintiff at his request, and which defendant was always ready and willing to pay over and account for, when called upon.

On the trial, Richardson's signature to the receipt was proved, and the receipt read in evidence. Futrell, the plaintiff, testified that in January, 1863, defendant was indebted to him in a large sum of money, for services as overseer's wages, from 1st of January, 1858, to January, 1863, and for money lent to him in 1859 ; that on the 23d of January, 1863, defendant paid him $1000 for his services as overseer in 1862, leaving a balance then due, principal and interest, of $6850, of which $2800 was for borrowed money, and the balance for overseers' wages ; that said sum was due in gold, or its equivalent ; that on or about the 23d of January, 1863, defendant came to his plantation in Yazoo county, on which plaintiff was overseer, and proposed to pay him the amount he owed him in Confederate money, but plaintiff, not having much confidence in it, was unwilling to receive it, but after some conversation with defendant, who seemed anxious about it, and stated to plaintiff that it could be judiciously and safely invested in slaves, plaintiff agreed to give up to defendant the note against him which plaintiff held for the amount due, and to take the receipt (above mentioned), and did so ; that no Confederate money or other money was actually paid by defendant to plaintiff at the time, nor did Richardson

offer to pay any or count any, nor did plaintiff see any in defendant's possession, although he stated he had it, and was ready and anxious to pay; that some time after this, defendant informed him that he had bought some slaves from Watkins, which plaintiff could have, if he liked them, not stating that they had been bought for plaintiff. Plaintiff declined taking them. Some time afterwards, defendant informed plaintiff that he had bought a woman and children from Mrs. Bradford, in Alabama, for $2500; that the woman would soon be confined, and as soon as she was able to travel, she and the children would be sent to Mississippi, and that plaintiff could have them; did not say that they were bought for plaintiff, or that the title to them was taken in plaintiff's name; plaintiff agreed to take them when delivered to him, if he liked them, but they were never delivered; also told defendant about same time, June or July, 1863, he wished him to make no more purchases or investments in slaves for him, and to keep his money. About this time plaintiff entered the Confederate army, and remained in service until after the surrender; never received any money from defendant, nor called on him for any; that in the spring of 1865, defendant paid plaintiff's wife $400 in Confederate money, which he is willing should be credited on his claim. Defendant, in 1865, advanced plaintiff $100 in greenbacks: it was not a loan, but was to be taken out of his wages for the year 1866, he then being overseer for defendant. Plaintiff never called on defendant for a settlement or payment of the amount due by the receipt, till the spring of 1867, or fall of 1866. No conversation had ever occurred between them about it till that time. Defendant never informed witness (plaintiff) that he could not invest the money, and never offered to return it before the close of the war, or account for it; never informed plaintiff that Confederate money was depreciating; nor did he, plaintiff, give him instructions how to invest it, or call on him for it, before the close of the war.

Defendant proved by Watkins, that defendant, Richardson, purchased of him, for Futrell, five slaves for $5800, and took bill of sale to the slaves in Futrell's name; that defendant also

purchased of Mrs. Bradford a family of negroes, for plaintiff, Futrell; that plaintiff told him he was not pleased with the first purchase, and that Richardson had taken them off his hands, and that he was much obliged to him for it.

Mrs. Bradford proved the sale of a family of negroes by her to E. Richardson, defendant, at $2500; that Richardson told her at the time the negroes were for Futrell; that the negroes were valuable, and were worth the money.

Defendant testified: That Futrell had been in his employment as overseer; that he settled with him every year, and gave note for any balance due him. On January 1st, 1862, he had a settlement, and owed plaintiff $7,108.31, for which he gave his note. In the latter part of 1862, after getting plaintiff to agree to take Confederate money for his debt, defendant sold his cotton for Confederate money, and in January, 1863, went to his plantation to pay off plaintiff, taking the necessary amount of money with him; plaintiff seemed loth to receive it; as he had entered the army, he said he did not know what he could do with it; made no objection to it on the ground that it was Confederate money; that he, defendant, counted out the money, and believes it was in plaintiff's presence; paid plaintiff $1000; retained balance on the agreement to invest the same in negroes for plaintiff, and executed receipt herein mentioned, whereupon plaintiff delivered up defendant's note for $7,108.31; that he did buy negroes from Watkins, under this agreement, for plaintiff, who, being dissatisfied with them, defendant kept them himself; that he afterwards bought from Mrs. Bradford a negro woman and children, of which he notified plaintiff; that plaintiff did not object to this purchase, but directed defendant to make no more investments for him, but to keep the money till he called for it, or directed him what to do with it. This, defendant did, always having on hand money to pay up, subject to plaintiff's order. Defendant further stated, that the negroes were bought from Mrs. Bradford, in Huntsville, Alabama; that at the time they could not be moved, for the reasons that the woman was in the family way, and would soon be confined; that they were to be sent to plaintiff as soon thereafter as prac-

ticable, of all which he told plaintiff fully; that not long afterwards, the Federal army occupied North Alabama, after which it was impracticable to get them to plaintiff's possession. Defendant further testified, that plaintiff never called on him for the money, nor directed him what to do with it; that at the request of plaintiff's wife he paid her $400 in April, 1865, in Confederate money; that he did not invest any more of plaintiff's money, but kept it on hand ready for plaintiff when called for; cannot say that he kept the identical bills, but the same kind of money, and in amount always on hand sufficient to pay plaintiff. After the war, he retained plaintiff as his overseer in 1865, at which time plaintiff set up no claim against him; asked defendant to lend him $100, which he did; this was afterwards repaid, by allowing him that amount as a credit on settlement for his wages for 1865. Sometime in the latter part of 1866, or early in 1867, plaintiff first suggested that defendant owed him anything, which defendant then promptly denied.

This is substantially the testimony in the case.

The following charges were asked in behalf of plaintiff, viz.:

1. If the jury believe from the evidence that defendant was indebted to plaintiff in the sum of $6850 for overseer's wages, and loaned money, in January, 1863, and that no part of the same has been paid, except $400, they should find the balance for the plaintiff, with interest from the date of the settlement until the present.

2. If the jury believe from the evidence that by the terms of the settlement made between plaintiff and defendant in January, 1863, the defendant agreed to invest the sum, he was found to be indebted to plaintiff in negroes, and that by the terms of that agreement defendant was to exercise his discretion as to the purchases; still the defendant was bound to exercise that discretion in good faith, and to exercise care and prudence in the matter, and consult the real interest of plaintiff; and if the jury believe from the evidence, that defendant did make a partial purchase of negroes for plaintiff under such agreement; yet if defendant managed the matter in so

negligent a manner as that plaintiff realized no advantage from the purchase, defendant is not entitled to charge plaintiff with the amount of such purchase.

3. An agent who undertakes to invest funds for a party in negroes is held to good faith and ordinary diligence, such as a prudent man would use in his own affairs; and it is the duty of such agent to take titles to the property, and deliver the same to his principal, and also to deliver the property purchased, or give notice of the purchase, and information as to where the property is.

4. Confederate money never was a legal tender. If such funds were counted out and offered to a creditor, he was not bound to receive them.

5. If one to whom money is due, payable in dollars and cents, without designating any particular currency, should without consideration, subsequently agree to receive depreciated currency in payment, he is not bound to receive such funds when tendered.

6. An agent who receives money for investment for another, failing to make the investment, is bound to account for the money; and if the particular funds are going down in the market, and likely to become worthless, the agent is bound to return, or offer to return, the funds to his principal. The agent is bound to use such diligence in that matter as a prudent person would use in his own affairs.

7. If the jury believe from the evidence, that defendant received from plaintiff $6850 in Confederate money, to be invested for plaintiff in slaves; that defendant only invested $2500 of the funds; that he kept the remainder of the funds on hand during the war, without investing them, unless he was so directed by his principal not to invest, there being an opportunity of doing so; that plaintiff saw that the funds were continually depreciating, and likely to become worthless by the failure of the Confederate cause; and that during all this time did not return the funds to plaintiff, or offer to do so — then defendant failed to exercise the diligence and good faith required of him

by law, and plaintiff should not be charged by the jury with the amount of money not invested.

8. The purchase of slaves from Watkins is not, under the pleadings and admissions in this cause, to be considered by the jury in reduction of the demand sued for.

9. If the jury believe from the evidence, that the receipt of defendant was given to evidence the ascertained pre-existing indebtness to Futrell, and *did not represent*, by the intention and contemplation of the parties, *Confederate money*, then the jury should not put the same on the basis of Confederate money.

10. If the jury believe from the evidence that the receipt given by Richardson did not represent Confederate money, then defendant cannot claim to be exonerated, because all the Confederate money he had perished in his hands.

All of which were given, except the last two.

The following charges were asked by defendant, viz. :

1. If the jury believe from the evidence in this cause, that defendant was indebted to the plaintiff on January 23, 1863, for overseer's wages and money loaned, and that the defendant gave him a note in payment of the same, plaintiff cannot recover on the open account sued on in this action.

2. If the jury believe that defendant offered to pay to the plaintiff the debt he owed him, and was ready to pay it in Confederate money, and that the plaintiff agreed so to receive it, and thereupon gave up to defendant his note, and that defendant retained the money in accordance with the wishes of plaintiff to invest for him in the manner specified in the receipt, then plaintiff cannot recover upon the note or upon the open account, but only for a failure to invest the money, or account for it, as agreed upon in the receipt.

3. In order to constitute a payment by Richardson, it was not necessary that the money should actually have passed from Richardson's hands to Futrell's; but it would amount to a payment, if Richardson was ready and offered to pay, and Futrell agreed to take it, and, in accordance with the wishes of Futrell, Richardson retained the money to invest for Futrell in the manner specified in the receipt filed with the declaration.

If Richardson invested a part of the money belonging to plaintiff in slaves for plaintiff, as specified in the receipt, and was at all times ready to account for and pay over to plaintiff the remainder in the kind of funds he had belonging to plaintiff, then plaintiff cannot recover of defendant, although the slaves so purchased may have afterwards been set free, or the Confederate money have become worthless.

5. It was not necessary that Richardson should have kept the specific notes belonging to Futrell separate and apart from his own; but it was sufficient compliance with his receipt if he at all times kept on hand a sufficient sum of the same kind of money to pay over to Futrell, or to invest for him.

All of which were given, except the fifth.

The jury found in favor of plaintiff $5.207,41 damages.

*W. & J. R. Yerger*, and *W. Yerger, Jr.*, for plaintiff in error.

This is a case of bailment; the contract set out in the receipt is that kind of bailment known as a mandate, defined to be " a contract by which a lawful business is committed to the management of another, and by him undertaken to be performed without reward." Story on Bailments, ch. 3, § 137, p. 130 *et seq*

As this kind of a contract is wholly gratuitous, and for the benefit of the mandator, the mandatary is bound only to slight diligence, and responsible only for gross neglect. Story on Bailments, ch. 3, § 174, pp. 167–8.

But the agreement was terminated in July, 1863, by plaintiff Futrell directing Richardson to make no more investments for negroes, and to keep the money until called for. Richardson made no more investments, but kept the money ready at all times, subject to Futrell's order, and had it when this suit was instituted. Under this last arrangement, the contract ceased to be a *mandate*, and became a bailment of another kind, in which the relative rights and duties of the parties were not materially changed, and is called a *deposite ;* defined to be " a naked bailment of goods, to be kept by the bailor without reward, and to

be returned when he shall require it." Story on Bailments, § 41, ch. 2, p. 41. The delivery may be actual or constructive. Another definition is given by the same author (ch. 2, § 61); and the bailee's liabilities are for slight diligence and only chargeable for gross neglect. Ib., § 62.

These principles seem to have been overlooked by the judge in the court below, in his instructions to the jury, which exacted of the defendant a much greater degree of care and diligence than the law imposes, and instead of an agreement to keep and deliver on demand, he is required to actively intervene and perform the duties of a general agent employed for a reward to manage the affairs of his principal.

The first instruction given is erroneous, because only an abstract rule of law and calculated to mislead the jury; because plaintiff and defendant both testify, that in January, 1863, defendant paid his debt to plaintiff, and afterwards was only liable as bailee to keep and invest the plaintiff's money.

The second instruction is erroneous in this, that it entirely omits to define the negligence that would make the defendant liable to plaintiff in the case supposed in the instruction; as a mandatary, the defendant was only liable for slight diligence, and to be held responsible for gross neglect. But under this instruction the jury were obliged to find in favor of plaintiff, if the defendant was guilty of slight neglect; whereas he was only liable for gross neglect, and it was the duty of the court to have so qualified the charge.

The fourth instruction was not applicable to the facts of the case, and tended to confuse the minds of the jury.

The same may be said of the fifth instruction.

The sixth is most objectionable : it is not only irrelevant to the facts proven, but as applied to this case is grossly erroneous. Plaintiff states that he directed defendant to make no more investments in slaves for him, but to keep his money. Richardson proves the same, and that plaintiff also directed him to hold it for him till he called for it, or directed him what to do with it. Richardson then became a mere depositary; all he had to do with the money was to keep it till called for, was

under no obligation to inform him of its depreciation, nor offer to return it, the sources of information being alike accessible to both.

The seventh instruction is still more palpably objectionable. It entirely changes the contract of defendant. Instead of keeping and returning on demand, it makes him liable for not investing, though not directed. It not only held Richardson liable for a failure to invest in slaves, but also for a failure to make a general investment of the money on account of plaintiff, because the money was continually depreciating, and likely to become worthless. It also required him to return or offer to return the money, without any demand on the part of plaintiff.

The court erred in refusing the fifth instruction of defendant. There was no special deposit, no particular bills or notes left; it was only a general deposit, and it was immaterial whether Richardson kept the identical bills or not, provided he always kept on hand, ready to pay Futrell the same kind of money.

The court below should have granted a new trial. The verdict of the jury was without evidence.

*D. Shelton.* on same side.

The verdict in this cause ought to be set · aside, because contrary to the law and evidence.

During the transactions, the bailment by which Richardson held Futrell's money assumed two very distinct characters, created by Futrell's own action.

First, the bailment which existed while Richardson was authorized to invest the Confederate money in slaves.

Second, the bailment which existed after Futrell countermanded the authority to invest, and left the money in Richardson's hands.

Under neither character of bailment did Richardson fail to perform his duty.

As to the first, the receipt measures Richardson's duties while acting as such bailee of the Confederate money. No other instructions are proven or pretended ; the investment was

to be made, not in any particular description of negroes, but in such as Richardson's judgment might direct. It was not to be invested in any specified time. Richardson was given full discretion as to the kind of negroes, the prices, and the time.

Such an agent, even if employed, with a salary, would be liable only for negligence or fraud; so long as he acted in good faith and without negligence, his principal would be bound to accept his transactions. There is no pretence of fraud or negligence as to the prices or quality of the slaves purchased, or that the purchases were *injudicious :* there can be but one pretence of negligence : that is as to *time.* The first purchase was made about a month after the date of the receipt, and nearly the whole of the money then invested. . Futrell was informed of the investment, and made no objection to it, found on either negligence or fraud, but only a preference for women and children — of which, Richardson was ignorant — even if such preference existed at the date of the receipt or purchase Richardson could then have forced Futrell to accept the investment; his failure to do so was a mere voluntary concession to Futrell's wishes.

The second purchase was made in a month after the first; less than a month after Futrell declined the first purchase. The negroes last bought were such as Futrell directed, and there was no complaint as to price or kind.

Futrell was informed of the whereabouts of the negroes — the circumstances under which they had been left at Mrs. Bradford's. There is no pretence of bad faith or negligence as to that purchase; no disclaimer of it by Futrell, but acquiescence and recognition, and directions then given to Richardson to make no further investment in negroes for him. Up to this time Richardson was a mere mandatary, acting without compensation, and liable only for fraud or the grossest negligence. The proof shows him guilty of neither; but Futrell, now, after years have elapsed, after slavery has been abolished, seeks to disclaim Richardson's purchase. The law is, that when informed of his agent's action, he cannot acquiesce therein until he uses the profits thereof; and if disastrous, then repudiate

and hold the agent liable, but if he does not accept it, he must reject it promptly.

1 Parsons on contracts, p. 51, and *note ;* ib. pp. 81–2, and *notes.*

Second, as to the bailment which existed after Futrell countermanded Richardson's authority for the purchase of negroes, there is even less pretence of liability. From that time Richardson was a mere depositee of a fund subject to the depositor's orders. He had no authority to invest; he did precisely what his duty required of him: he held the money subject to Futrell's order. Futrell never called for it, or otherwise disposed of it, or directed it to be disposed of, until, by the result of the war, the money became worthless.

During this bailment no negligence is shown against Richardson.

The first instruction of the court below authorized the jury to say that the payment of the Confederate money, the deposit thereof with Richardson, the execution of his receipt, and the investments, were not a discharge of the original debt. That was not law, and was calculated to mislead the jury and authorize them to find a verdict for plaintiff on the account for overseer's wages, or on the note delivered to Richardson and discharged.

The second instruction means nothing less than this: That though Richardson had authority to buy the slaves for plaintiff, yet if he managed the matter in so negligent a manner as that plaintiff realized no advantage from the purchase, then defendant is liable. There is no proof in the cause applicable to this charge, and if correct as an abstract principle, should have been refused.

The third instruction should have been qualified by adding thereto the doctrine of acquiescence after plaintiff was informed of the purchase.

The sixth instruction — That an agent, having funds in his hands belonging to his principal and subject to his order, the principal suffers it to remain while the funds are depreciating and likely to become worthless, that the agent will be liable,

unless he returns the funds, or uses diligence in that respect. This is erroneous — not law.

The seventh instruction is no better. It is in substance, that an agent or depositee of funds directed *not* to invest, but if he sees the money is continually depreciating, he *must invest* without orders, and that, too, although the depositor knew the state of the market as well as the depositee did.

*Johnston & Johnston* for defendant in error.

This cause was decided on the testimony of the parties, and the action of the jury is conclusive; there being a conflict of testimony, the jury gave credit to one and rejected the other. The court here cannot reverse this action of the jury, and thereby say that in the trial below the jury should have believed the defendant and not the plaintiff. The jury are the sole judges of evidence; it is their province to reconcile conflicting testimony, if praticable, and if not, to reject that which they consider not entitled to belief; their exercise of this duty cannot be reviewed by this court. This court will not set aside a verdict, unless the same is manifestly against the weight of the evidence. *Dickson* v. *Parker*, 3 Howard, 219; *Harris* v. *Holliday*, 4 ib. 338; *Leflore* v. *Justice*, 1 S. & M. 381; *Vanvacter* v. *Brewster*, ib. 400; *Elzy* v. *Stone*, 5 S. & M. 21.

By the testimony of Futrell, the jury were bound to find for him, if they believed him in preference to the defendant. He was Richardson's overseer for the years 1859, '60, '61, '62, and '63, for which defendant was indebted to him. Richardson also collected for Futrell $2800 from Robinson, a debtor of his, and held the money by plaintiff's permission. Defendant's whole indebtedness to plaintiff was $6850, for which defendant gave his note. *All this was in good money.* In January, 1863, defendant offered to pay in Confederate money; plaintiff declined it. No notes were counted or tendered. No Confederate money passed from the hands of defendant to plaintiff; but, persuading plaintiff that the money might be invested in negroes, finally induced him to consent that the indebtedness might be so invested, according to defendant's discretion. sub-

ject to plaintiff's approval. Defendant bought some slaves, which plaintiff not approving, he kept them himself. In April or May, 1863, defendant bought for plaintiff, from Mrs. Bradford, a negro woman and three children, for $2500 Confederate money. No further investment was made. At the time of this purchase, the negroes were in Alabama; plaintiff lived in Yazoo county, Miss., and the woman was in the family way, and could not travel. This family of negroes were never delivered to plaintiff. No bill of sale was delivered. Plaintiff was not informed of the purchase until June or July, 1863, when plaintiff told defendant where the negroes were delivered; if he liked them, he would take them; but they were never delivered.

Contended that the giving up the note of defendant and substituting the receipt was not a payment of the debt in Confederate money or any other funds; that it was only intended to show that Richardson had authority to invest in negroes what he owed Futrell; that it is conceded Richardson thus became Futrell's agent for investing his funds — not *Confederate money*, but the *good funds* — which he owed Futrell.

Let us examine Richardson's conduct as such agent, guided by the well-settled rules of law on this subject. He had in his hands, on January 23, 1863, $6850 belonging to Futrell, which he agreed to invest in negroes, "as his judgment might direct." How has he discharged that duty? Has he been faithful and diligent? We say not. The first purchase was refused. As to the second, at that time the fortunes of the Confederacy were waning; negro property was so uncertain, that no prudent man would have invested in it; the Federals were everywhere victorious; Alabama had been invaded; yet this agent at the time purchased a woman and children, she being not in condition to be moved, and compelled to stay at a point soon likely to be overrun. This was in April or May, 1863, and no notice was given until July, 1863, when Richardson said Futrell might take them if he liked them, when the negroes came to the plantation in Mississippi. It was not to be a purchase for Fut-

rell, unless he liked them. They were never delivered to or approved by Futrell.

Contended that Richardson did not act in good faith and with prudence; that he kept the funds, knowing they were becoming daily of less value; never gave any notice to Futrell of the constant depreciation of the money, and never offered to return it. This is apparent from the proof relative to his conduct, admitting for the argument that he had paid Futrell Confederate money, and that sort of funds was afterwards deposited with Richardson for investment. But the truth is, Richardson owed Futrell good money, which was never paid beyond the credits admitted. The scheme about investing in slaves at a time when the institution was doomed, was but a machination of an artful and astute managing man to avoid the payment of his debt.

On the subject of agency, and the duties and responsibilities of agents, we cite the following authorities. Story on Agency, §§ 183, 184, 186, and 200; *Leverick* v. *Meigs*, 1 Cowan's Rep. 645; *Savage* v. *Brickhead*, 20 Pick. 167.

As to the instruction of the court below, we see no errors. All asked by defendant were given, except the fifth; this was properly refused.

1. It assumes the very point in controversy in favor of Richardson's version, which is contradicted by Futrell, viz.: that there were specific notes of Futrell's placed in Richardson's hands, and if given, would have taken from the jury the right to reconcile the conflicting statements of the parties.

2. The instruction assumes that Richardson received Confederate money from Futrell, when the proof and the verdict of the jury show the fact to be otherwise.

3. The instruction contains the idea that an agent having funds to *invest* can either invest, or let the funds perish in his hands by negligence, and avoid responsibility by simply showing that he held plenty of the same kind of trash to meet his liability to his principal.

The court below committed no error in giving instructions for

plaintiff; they properly expound the law as applicable to this case. Story on Agency, § 183, 184, 186, and 200.

The court committed no error in refusing to set aside the verdict; it was in accordance with all the instructions given and most just and equitable, and well supported by the evidence. When the court below refuses to set aside a verdict on motion, this court will not interfere with the exercise of the discretionary powers of the court below, except in a case where it is perfectly clear that the motion should have been granted.

If the verdict is excessive, the plaintiff below had a right to remit the excess on suggestion, and let his verdict stand. *Young* v. *Englehard*, 1 How. 19; *Green* v. *Robinson*, 3 ib. 105; *Hurd* v. *Germany*, 7 ib. 675.

A new trial will not be granted if verdict be correct, merely because the instructions are erroneous, unless correct instructions would have changed the result. *Hill* v. *Calvin*, 4 How. 231; *McClanahan* v. *Barrow*, 27 Miss. 664; *Perry* v. *Clarke*, 5 How. 495; *Philbrick* v. *Holloway*, 6 How. 91; *Cartwright* v. *Carpenter*, 7 ib. 328; *Simpson* v. *Bowden*, 23 Miss. 524; *Dunlop* v. *Edwards*, 29 ib. 41.

SHACKELFORD, C.J., delivered the opinion of the court.

This is an action of assumpsit in the First District Circuit Court of Hinds county, founded upon the following receipt or instrument of writing:

"YAZOO COUNTY, January 23, 1863.

"Received of M. J. Futrell, six thousand eight hundred and fifty dollars, to be invested for him in negroes, as my judgment may direct, and to be accounted for by me.

"E. RICHARDSON."

There was also a second count in the declaration, for work and labor as overseer, and the money counts.

An account for overseer's wages before January, 1863, for $4050, also for money collected of Mrs. Robinson in February, 1859, amounting to $2800.

Defendant pleaded "non assumpsit" and "payment," with

special notice that "proof would be given that the money received by Richardson was" Confederate money; "that part of it was invested in slaves for plaintiff Futrell, and the remainder kept by Richardson for plaintiff at his request, and which defendant was always ready and willing to pay over and account for, when called upon by Futrell."

Issues were made and the case submitted to a jury, and verdict rendered for defendant in error for the sum of $5,207.41, and judgment rendered thereon.

Plaintiff in error moved the court for a new trial. The motion was overruled, and exceptions taken to the ruling of the court. All the proof in the case, instructions given and refused, are embraced in the bill of exceptions, and the plaintiff brings the case here by writ of error.

We shall consider and determine the first, second, and third assignments together.

The first is, that the court erred in refusing the motion for a new trial.

Second, that the court erred in giving the first, second, third, fourth, fifth, sixth, seventh, and eighth instructions asked for by the plaintiff below.

Third, that the court erred in refusing the instructions asked by defendant below.

The disposition of the points raised by the *second* and *third* assignments of error will decide the first assignment of error.

The first instruction objected to it is as follows: "If the jury believe from the evidence that the defendant was indebted to plaintiff in the sum of $6850 for overseer's wages and loaned money, in January, 1863, and that no part of same has been paid, except $400, they should find the balance for the plaintiff, with interest from the date of the settlement until the present."

This instruction would have been correct if there had been no controversy in relation to the indebtedness and kind of indebtedness, whether it was upon the receipt or instrument of writing filed, or upon the open account.

It will be seen from the proof in the case, that the note of plaintiff in error to Futrell, due on the first day of January,

A.D. 1863, was given up to the plaintiff in error in the settlement between Richardson and Futrell on the 23d day of January, A.D. 1863, at which time the plaintiff in error paid Futrell the sum of $1000 for his wages as overseer for and on Richardson's plantation for the year 1862; that on that settlement the "receipt" sued on in this action was given to Futrell.

This instruction, as given, seems to direct the jury to disregard the receipt for the money, and to find upon the open account filed with the *second* count in the declaration.

It directs them to find for the plaintiff below *if there was no payment to Futrell;* virtually excluding from the jury all the evidence on the trial, introduced by plaintiff in error to show why there was no payment by Richardson to Futrell of the money mentioned in the receipt of Richardson.

The jury were, under this instruction, to consider the character of the indebtedness the same after Futrell had given up to Richardson his note due the 1st of January, 1863, as it was before the surrender of this note and the taking of the receipt by Futrell on the 23d of January, 1863, for $6850, by which he undertook to invest the money therein mentioned in negroes for Futrell.

It was calculated to mislead the jury, and may have done so. In view of the testimony in the case, the giving of this instruction was erroneous.

The next instruction objected to is the *second,* which is in these words: "If the jury believe from the evidence, that by the statements made between plaintiff and defendant in January, 1863, the defendant agreed to invest the sum, he was found to be indebted to plaintiff in negroes, and that by the terms of that agreement, defendant was to exercise that discretion in good faith, and to exercise care and prudence in the matter, and consult the real interest of plaintiff; and if the jury believe from the evidence, that defendant did make a partial purchase of negroes for plaintiff under such agreement, yet, if defendant managed the matter in so negligent a manner as that plaintiff

realized no advantage from the purchase, the defendant is not entitled to charge plaintiff with the amount of such purchase."

The receipt of Richardson to Futrell for the money to be invested in negroes for Futrell, creates a case of *bailment* known as a *mandate*, which is defined to be "a contract by which a lawful business is committed to the management of another, and by him undertaken to be performed without reward." Story on Bailments, ch. 3, § 137, pp. 130 *et sequitur*. According to the general principles regulating contracts of this kind, "a mandatary, as the contract is wholly gratuitous, and for the benefit of the mandator, is bound only to slight diligence, and of course is responsible only for gross neglect. This is the doctrine of the common law universally applied to mandates." Id. ch. 3, § 174, pp. 167–8.

The court below seems to have lost sight of the doctrine of mandatary bailments just adverted to, in suffering this instruction to go to the jury without specifying the kind of negligence the plaintiff in error should be made liable for.

The instruction is too broad. It was in evidence before the jury that the plaintiff in error had made two purchases for the defendant in error. One he had declined to take; the other he was certainly notified of: by his own admission it is proven that he was in possession of all the information that Richardson had. He was advised of the purchase soon after it was made, also the reasons why the negroes were not delivered or brought to defendant in error: this last fact was communicated to him at the time he informed Richardson to purchase no more negroes.

Then there was also a question of acquiescence to be considered by the jury: certainly Richardson could not be responsible for the invasions of the Federal armies into the district of country where the negroes purchased of Mrs. Bradford were.

Richardson could be held responsible, with as much propriety, for the loss of these negroes, had he transported them immediately to Mississippi from Alabama to his plantation, where the family of defendant in error was living during the war, and though no actual delivery by Richardson had been made to

Futrell, and while there on his plantation, the Federal forces had captured them, or prevented their removal.

Without any proof of the repudiation of this purchase, the jury were authorized to find against the plaintiff in error, and hold him responsible for his outlay for the negroes purchased from Mrs. Bradford. There was no proof of such negligence in this second purchase warranting such a broad and unqualified direction to the jury to find against the plaintiff in error.

It is in direct conflict with the well-settled doctrine governing this kind of bailment, and it was error to give the instruction without modification.

The third and fourth instructions given and objected by plaintiff in error contain mere abstract principles of law, and should have been refused, as they are not made applicable to any supposed state of facts appearing in the case, being therefore irrelevant, and calculated to embarrass or mislead the jury.

The next instruction objected to and given for the defendant in error is the sixth, which is as follows: "An agent who receives money for investment for another, failing to make the investment, is bound to account for the money; and if the particular funds are going down in the market, and likely to become worthless, the agent is bound to return, or offer to return, the funds to his principal. The agent is bound to use such diligence in that matter as a prudent person would use in his own affairs."

After the defendant in error instructed plaintiff in error not to invest any more of his money in negroes, the plaintiff in error was no longer Futrell's agent to invest the money so held by him; but held it as a deposite, subject to the order and control of Futrell.

The character of the bailment having been thus changed by the order not to invest, etc., Richardson became a mere depositary of the funds uninvested of Futrell.

Judge Story defines this kind of bailment to be "a bailment of goods to be kept by the bailee without reward, and delivered according to the object or purpose of the original trust." Story on Bailment, § 41, ch. 3, p. 41.

The duties of a depositary are, that he shall keep it with reasonable care, and that he shall, upon request, return it to the depositor, or otherwise deliver, according to the original trust. Story on Bailments, ch. 2, § 61. "Such bailee is only liable to slight diligence, and therefore not answerable, except for gross neglect." Ib. ch. 2, § 62. And he must take reasonable care of the deposit.

These rules are well settled in this character of bailments.

The plaintiff in error, after the notice from Futrell in June, 1863, was directed not to make any more investments in slaves, but to keep the money. Richardson's testimony about the notice differs from Futrell's in this, that Richardson "was to keep it for him until he called for it, or directed him what to do with it." This statement, in addition to what Futrell said relative to this order, does not affect the responsibility of Richardson to Futrell. There can be no question as to the legal effect of the order. The fund was certainly as much under the control of Futrell after he gave Richardson notice not to invest any more of it in negroes, as if he had instructed Richardson "to keep it until he called for it, or instructed him what to do with it." Richardson's version of the order.

If the money in the hands of Richardson, belonging to Futrell, was notes of the Confederate States, or Confederate money, there being testimony in the case that it was Confederate money, Richardson was not under any obligation to return, or offer to return the funds in his hands to Futrell, because the "particular funds were going down in the market, and likely to become worthless."

It is shown by the testimony in the case, that both parties were residents of the State of Mississippi, one of the States constituting the "so-called Confederacy," and each party had the same opportunities and facilities to find out the depreciation of the Confederate notes. Richardson was not bound to use any other diligence than to safely keep the funds in his hands; and if the defendant in error neglected to instruct the plaintiff in error what to do with the funds, he must bear the loss caused

by the depreciation of the kind of funds alleged to have been deposited by Futrell in the hands of Richardson.

There being no evidence that Richardson gave notice to the defendant in error that the Confederate money was depreciating, or that he offered to return the same, the jury were, under this instruction, bound to find for Futrell, if they believed the funds were Confederate money. It is clear that this instruction is in conflict with these views of the law, and could hardly have failed to mislead the jury in their consideration of the evidence before them, relative to the deposit of the funds in Richardson's hands. For these reasons we think the instruction should not have been given.

The next instruction excepted to and given for the defendant in error is the seventh, which is in these words: "If the jury believe from the evidence that defendant received from plaintiff $6850 in Confederate money, to be invested for plaintiff in slaves; that the defendant only invested $2500 of the funds; that he kept the remainder of the funds on hand during the war, without investing, unless he was so directed by his principal not to invest, there being an opportunity of doing so; that plaintiff saw that the funds were continually depreciating, and likely to become worthless by the failure of the Confederate cause; and that, during all this time, defendant did not return the funds to plaintiff, or offer to do so—then defendant failed to exercise the diligence and good faith required of him by law, and plaintiff should not be charged by the jury with the amount of money not invested."

This instruction directs the jury to hold the plaintiff in error responsible for not doing that which he was prohibited from doing by the notice from Futrell to Richardson in June, 1863. He had no power given him to invest the money, and any investment of the funds by Richardson would have been on his own responsibility, and in violation of the instructions of Futrell. Although Richarson knew the funds in his hands were depreciating, he was not bound, for the reasons we have stated before, to give the defendant in error notice of such depreciation.

The statement in this instruction, that "the defendant failed to exercise the diligence and good faith required of him by law," for not returning the money, etc., was placing by the court a responsibility upon the plaintiff in error unwarranted by the facts of the case or by the law applicable to them. This was a direction, in other words, to find a verdict for the defendant in error for the balance, after deducting the $2500 invested in slaves, left in Richardson's hands.

For these reasons the instruction should not have been given.

It is insisted by counsel for plaintiff in error, that the fifth instruction asked for Richardson, and refused, should have been given. It is in these words: "It was not necessary that Richardson should have kept the specific notes belonging to Futrell separate and apart from his own; but it was a compliance with his receipt, if he at all times kept on hand a sufficient sum of the same kind of money to pay over to plaintiff, or invest for him."

There was no special deposit of any particular Confederate notes made by Futrell; the testimony touching this point shows that there was only a *general* deposite of the money; that Richardson at all times had a sufficiency of Confederate notes on hand to pay the amount received, whenever demanded : this was all he could be required to do.

It should have been given by the court, and it was error to refuse it.

We deem it unnecessary to express any opinion on the other grounds insisted upon for a new trial, or upon the position assumed by counsel for the defendant in error, that "the verdict is manifestly correct, and sustained by the evidence." It might prejudice the case, as a new trial will be awarded. We should not say anything that might have a tendency to prevent a fair and impartial consideration, by the jury, of the evidence on the next trial.

For the errors before stated, the judgment will be reversed, the verdict set aside, and the cause remanded for a new trial.